Do you have any of those sausages, thanks? I would love one. Just one. Be right with you. Mr. Hirsch, good morning. Oh, I got the wrong thing then. Oh yes, sorry to call you the wrong name. No, I thought my name got shortened all of a sudden. It's Attorney John Siskopoulos. We Americanized the name, but we kept the Greek name going. Very good. May it please the Court, Attorney John Siskopoulos, on behalf of Appellate Joseph Angioni. This case stems basically with three basic issues here, and the three basic issues that we're seeking a reversal of the judgment of the lower court is we believe that rebuttal evidence was wrongfully excluded. Specifically, Mr. Angioni was castigated by the other side that he was unable to pass a rifle range test. Now, he was not only unable to pass the test, he missed all 30 shots. He was what? He missed all 30 rifle range shots from a distance of 30 feet, which I don't believe is much further from me to you. Mr. Angioni is a gunner in the military, and before he took that test, he passed it, I believe, when he was a cadet, and he scored a 97. He also took it subsequently, and he shot 30 for 30. Missing all 30 shots from 30 feet is akin to a professional basketball player missing 30 layups in a row. I mean, it's a very shocking score, and it's also shocking because Mr. Angioni is trying to be a police officer, and it's like I said, an NBA basketball player saying, I want to make the cut of the team, and I can't make a layup 30 times in a row. Well, Mr. Angioni was, I think, artfully portrayed by the other side that he was not a very safe officer, and one of the things that they portrayed was that he was unable to hit 30 shots in a row. So, what happened is, Mr. Angioni had rebuttal evidence that he hit 30 for 30 shots only three weeks later in a subsequent test, and the judge precluded the evidence at trial, and I believe that evidence would have told the jury, like what Mr. Angioni argued, that this rifle range test was not correctly performed, that he believed that the rifle had malfunctioned, and I believe that there is a tremendous amount of value to that because when a band hits 30 for 30 shots two weeks later and hits 30 for 30 a couple weeks before, missing all 30 shots is a bit unbelievable, and the jury never got to hear that he hit all 30 shots on two subsequent occasions. But, counsel, the issue ultimately isn't whether your client was a good marksman. The issue is whether, in deciding to terminate him, they were discriminating against him because of his status as a veteran. So, why so much emphasis on vindicating his ability as a good marksman when that really is not ultimately the issue at all? Because one of the arguments they made is that he was not fit to be an officer, that he was fired for cause. And one of the reasons he was supposedly fired for causes is that he could not hit a rifle range test zero for 30 times. Well, there were a few other causes, too, weren't there? I mean, a lot of them were non-discretion. I mean, they were discretionary, and the police officer's discretion. For instance, supposedly, he wanted to take a picture – I'm sorry, Officer Wren wanted him to take a picture with a bunch of teenagers who were possession of stolen property. Mr. Angioni believed that they were – potentially should have been arrested, and he said, let's let them take a pass. I don't think that's something that you should get terminated for. There was another instance where supposedly he looked at headstones and commented on the headstones. I mean, when I came back, I commented on the weather, that it was raining, and I hoped we'd have a nice trip back to New York today. But that doesn't mean I wasn't ready for argument. But, I mean, most – one of the major points here was the zero for 30 test. If it wasn't so important, why did they ask about 25 cross-examinations regarding that issue? And why is it one of the central themes of the closing argument? I believe that it was one of the major issues, and I think it was a major issue because they kept raising the issue over and over again. It made my client, who's a war veteran – What evidence do you have that he was terminated because of violations of the statute that you're claiming? Well, I'm saying that one of the things that they argued is that he was not properly fit to be a police officer. And one of the arguments they made is he could not pass the rifle range test. It's an amalgamation of a lot of issues, that he supposedly did not handle the rifle range test properly, that supposedly he had difficulty taking advice from superiors, and that he had supposedly some issues with Officer Moran, who admitted at trial – I should say Officer Edens admitted at trial that he did express an anti-military animus, that he felt it was unfair that Mr. Ingioni, who was only a rookie officer, would have preferential treatment over him in case there was cuts on the police force. Because back in 2009, as we all know, there was a great recession back in 2009. And even though no job cuts were ultimately executed by the police department, that doesn't mean that that palpable fear was not permeating through the department. For instance, if I said today there was going to be a snowstorm of 20 inches, and I went and bought a bunch of snow shovels, and I went and bought a bunch of ice picks, and all that other stuff, and then it said the storm veered to the left and it never hit Boston, that doesn't mean people didn't have a fear that that snowstorm wasn't going to happen. Of course that happens all the time. Where I live in New York, we had Hurricane Irene the previous year, and nothing ever happened. That storm never happened. So when Hurricane Sandy happened the following year, we honestly didn't take it very seriously and obviously caused a lot of damage. It flooded my house. What evidence was there that there was a palpable fear throughout the department? There's one comment by Officer Moran, and one isolated comment, you objected to evidence that there were other veterans on the force, but having made this palpable fear argument now in the context of one isolated incident, and now I'm trying to figure out how you could also argue at the same time that it was erroneous for the court to let in that other evidence about the status of the other police officers. Well, with regard to the fear, Officer Edens, I believe it's on page 13 or 14 of his testimony, said that he received a memorandum that seven police officers would be terminated that year. So it was not idle chatter. They claimed it was idle chatter.  That seven members of the force would be terminated that year alone. That's approximately 14 to 15 percent of the force. And if you're not a veteran like Officer Moran, your chances are about one in three of being terminated. And Officer Moran obviously would have a reasonable fear of being terminated because Officer Angione would have preference over him if he was not terminated because of the status that he had under USARA, that he was a disabled veteran. So I'm not saying if Officer Moran, I'm just saying that I believe that it's obvious that he would have a fear that a person who had much less experience than him would be able to secure his job for the next 20 years and Mr. Moran would ultimately lose his job to an officer who has much less years on the force. And you have to understand about Officer Moran, if you remember his testimony, it took him 15 years to get this job. He did not qualify. He did not pass the cadet school. He failed the physical, and it took him 15 years to get this job. And when these cuts were about to take place, he was only on the job for five years. So he was very worried about his job, and Officer Edens testified that he expressed that worry to him. With regard to the veterans issue, which you raised, which is issue number three, I don't believe the judge was fair. Trials, I've done trials. Trials are tough because everything happens very fast and quick at times, and judges have to make quick decisions. But why did this judge allow all this testimony to come in about the veterans, but all the other testimony about the veterans that another veteran sued under USERRA did not get admitted into trial? Did you object to that evidence? I have the impression that you fail to object. I do. I don't object. I think the judge made the right call. The judge should not bring in irrelevant issues like other parties suing under USERRA. I'm sorry. You're going too fast for me. I'm sorry. I only have ten minutes today. Well, okay. Did you object to this evidence coming in? He objected in a motion. He submitted a motion to eliminate, and he asked that the evidence of the other veterans on the police force be precluded from the trial. The judge denied that motion, eliminate without prejudice. That's correct. Which means that it was then up to trial counsel to renew that objection during the trial, which he didn't do. Well, here's one problem I have with that particular matter. Question. The law says. Why did he open an opening statement? He said in the first three sentences of the opening statement, 30 members of the force are veterans. He precluded my client's counsel from ever objecting because, as we know, in an opening statement, it's very tough to object in an opening statement. Courts often routinely will shush you up and say, please, don't interrupt the opening statement. He let the cat out of the bag. At that point, you couldn't stop him. The jury had already heard it. And even if you objected, it would have brought attention to an issue and only highlighted the issue that half the force was veterans. I think what counsel did was unfair. That might be trial strategy, but our case law does require that you interrupt your brother or sister on opening statement if they're saying something objectionable. Well, I believe it was a tough call on the part of counsel, but here's what I also believe. The judge himself, if you read his order, he said it was of low probative value. And I submitted, I believe I submitted several cases, which says that it's low probative value and that this honorable court finds it to be inflammatory, just inflammatory. Even under the plenary standard, a reversal would be required here. Why is it inflammatory? If you're claiming that the employer is anti-something and you have evidence that, in fact, most of or a large part of his workforce belongs to that group that you claim they're discriminating against, that seems to me to be a pretty logical sequence of events. No, because he never argued that the entire force was discriminating against Mr. Angiolini. Mr. Angiolini believed that this particular officer, Officer Moran, who was his field training officer, had an anti-military animus. Counsel, let me ask you. I want to understand the logic of that. You're focusing on Officer Moran. Now, he was not the decision-maker here. He is not the one who decided whether your client should or should not stay on the force. Isn't that correct? Just please, is that correct? He was not the decision-maker, but he influenced the decision-maker. That's the case law. Just so I understand your theory. So your theory is that he had a bias against veterans because it might affect his ability to remain on the force in the event of layoffs. And so acting out that bias, he falsely reported to the decision-makers all these deficiencies in your client's performance and in that way accomplished the termination of your client. Is that sort of the theory of your case? Well, to a certain extent, I wouldn't say it exactly like that, but I believe that he had a tremendous fear that he would lose his job, and I believe he reported to Chief Rosa that Mr. Angione was unfit as a police officer, and he made some ridiculous comments. So if it's your position that it's not – if the anti-veteran animus was limited to Officer Moran, it was not a generalized problem in the department, then there might be more force to your argument that it's not relevant. It's not relevant that there were a lot of other veterans on the force. Your focus is on the anti-veteran animus of Officer Moran. Is that a correct understanding of your argument? Yes, that would be my position, and that's exactly what the jury was there to decide. There was no jury instruction saying was there any anti-military animus to the entire force. Go look at the jury instructions. It's only regarding Officer Moran. That's what the case is about. Thank you. Can I just ask one question? Yes, of course. Thank you. On this sequestration issue, which is potentially an important issue, I get you were not trial counsel. No, I was not trial counsel. Okay. But you insist that there was a request of the court that the court order sequestration of witnesses. If there had been such a formal request or even a recognizable request and the court denied it, that would be a big deal. Where in the record do you support the proposition that there was, in fact, a request for sequestration? Well, he clearly tells the judge that the witnesses are not sequestered, and if you look at Officer Moran's testimony, he admits to hearing the testimony of Officer Edens. Okay, he says they're not sequestered, but he doesn't ask the judge to order sequestration. He just goes on and starts questioning. Well, with all due respect, I mean you could argue that the judge then gave him this information, that he had to file a formal written motion. Then you could say that the judge should have been more. No. That's not what the judge said. No, the judge said there's no written motion in front of him. The judge said there's no motion. There is nothing that would have prevented him from moving on the spot for sequestration. Most cases I've been in front of, and I've seen a lot of cases and handled cases, most judges who respond, they will say, if any witnesses intend to testify today, please remove myself from the courtroom. And if you look at the Shishelagh case. But that is not a requirement. It's not a requirement, but once. Well, if it's not a requirement. I didn't say it's not a requirement. I said that the judge, once he was brought to his attention, should have said, is this a formal motion?  Because I think that the judge is an officer of the court. He had to know that, it's my understanding from my client, that 12 or 13 officers were in the courtroom that day, and each one of them ultimately testified. And if the judge had received a motion and had not granted it, then you would have a case. But no motion was made. And I don't see why the judge has to, in view of the fact that everybody in the courtroom could see there were witnesses, potential witnesses present, for a judge to engage in what is basically a request that should be made by one of the parties. Let me be blunt here. I'm almost a very straightforward person. I don't think the trial counsel did a very good job of raising that issue. He didn't. I would have been much more forthcoming. Let me be blunt also. That is your client's burden. I know, but at the same time, there are special circumstances. And also, I would argue, even if you don't think the standard of review would be de novo, which we all agree would be here if you believe an objection was properly made, you still have the plain error standard, and you still have to say to yourself, did this affect the integrity of the proceeding? Did this affect the substantial right? I think the answer is clear. Yes, it would. Thank you. Thank you, sir. Mr. Silverfein, good morning. Good morning. May it please the Court. My name is Jeremy Silverfein. I represent the defendant, appellees. I'll address the issues that we just talked about. I was trial counsel. There was absolutely no request. In fact, I was expecting the next line from counsel to say, Your Honor, I make a motion to sequester. So be it. He made no request. He raised it, and he left it. He didn't make a verbal motion. He didn't make a written motion. In fact, I got the sense the judge was waiting for the next line. He didn't request it. He waived it. What about the plein air argument? It's pretty basic. In terms of preserving the integrity of the proceedings, the notion that you're going to have an array of witnesses sitting there in the courtroom hearing testimony that proceeds there so that they can be aware of that when they testify, in terms of the truth-finding function of the court, that's very troubling. I mean, why shouldn't the judge say, Okay, trial counsel did a lousy job, but the issue was presented to him. Why shouldn't the judge, in order to protect the integrity of the proceedings, say, Absolutely. Anybody out in that audience is going to be a witness out of the courtroom. I don't think it was plein air, and I think throughout the trial the only reference, in fact, in the appellant's brief is to Officer McDonald when he was cross-examined by plaintiff's counsel. He said, You were here on court on Monday, weren't you? He said, As a matter of fact, I wasn't. So there's no evidence in the transcript. So he says he was not? He was not in the courtroom. In other words, he was trying to make the inference that you heard everyone else, and he said, As a matter of fact, I wasn't here. Not every witness was there every day. Different witnesses came different days, Your Honor knows. He wasn't there. So the only evidence in the trial where he actually was attempting to use it, it was a null and void point. He didn't request it. He was supposed to have requested it when a party requested it. He didn't do it. As to the whole argument about the number of veterans, his complaint, which is a USERRA complaint, was based on the fact that the department, the very people he had sued, the chief, the town of Bell Rica, had expressed strong antagonisms toward veterans, plural, and that they had a general bias towards veterans. That was his case. His case was premised not on Officer Moran, as Your Honor correctly noted, was only his field training officer for a brief time in the very beginning of his field training. He ended his field training, meaning Officer Moran, with Mr. Angione in June. The department, despite Officer Moran's FTO field training with Mr. Angione, decided to extend his probation beyond June. He had July, August, September, October. And during that time, he had several, I think up to 15 officers who trained him. They all had input. They all sent it up to chain of command and said, this candidate has some serious issues. And the reason why the rifle incident, which they brought up as part of their case, was important is because his behavior on the rifle range was unsafe. The officers who were doing the rifle range testing all indicated that he was sloppy, that he wasn't paying attention, that he had his trigger finger next to the trigger. He was moving the gun around so that potentially he could hit someone. He wasn't taking their instructions seriously. And to the point of the rifle test or the subsequent rifle test that was not admitted, first of all, it's irrelevant. It wasn't during that period. Secondly, Chief Rosa testified was that he could still remain a probationary officer and an officer if that came to fruition, even without the rifle range test having been passed. So it's irrelevant. He said, look, he's got to be able to pass the handgun test, which he did. But the rifle range test, we can retrain him. We don't always get the rifle range. We basically use the local gun club. The next time they come around, he could use it. So the idea that this had any relevance to whether or not he became a police officer after his probationary term is not true. In fact, there's a long list of things that this gentleman could not do and was unsafe. And the example he just gave about the stop, it was a scavenger hunt. These were young girls on a scavenger hunt. They were like 17, 18 years old. And the other officer was saying, hey, look, I think it was Officer Moran, saying, hey, look, you've got to use discretion. We went up to him. We checked it out. You know, you could see they're on a scavenger hunt. And yet Angiolini wanted to prosecute everybody. He goes, you know, sometimes you don't do that. Sometimes you've got to use discretion, be smart about it. You know, we have their names. If anything comes up, we know where to find them. But, no, he insisted. He was giving Officer Moran lip. And that always came back, each and every one of these officers, several of whom were veterans. And, again, the whole idea of this case was anti-veteran sentiment. The veterans who worked with him said, hey, look, it's got nothing to do with the fact that whether or not he's a veteran. He is not a competent probationary officer to be a police officer to carry a gun and a badge. And we have very serious concerns. And we tried to work with him. We gave him different field training officers. And it keeps coming back. We're getting all this stuff. That's why he was terminated. In fact, Chief Rosa testified, I didn't want to terminate him. We already invested money with him for the academy. We spent months with him. We had people train him. I didn't want to terminate him, but I have an obligation as a chief of police to my community and my fellow officers that he do real harm. So that's why he terminated him. Your Honors, otherwise, I believe there's no other questions. I think I would rest on the reign of my written brief. Thank you. Thank you, Jacob. See you next time.